**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 24-5072**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

NATIONAL COUNCIL OF AGRICULTURAL EMPLOYERS,

Plaintiff-Appellant,

v.

U.S. DEPARTMENT OF LABOR, et al.,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the District of Columbia

_____

**BRIEF FOR APPELLEES**

_____

BRIAN M. BOYNTON
 *Principal Deputy Assistant Attorney
 General*

CHARLES W. SCARBOROUGH
DANIEL WINIK
 *Attorneys, Appellate Staff
 Civil Division, Room 7245
 U.S. Department of Justice
 950 Pennsylvania Avenue NW
 Washington, DC 20530
 (202) 305-8849*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiff is the National Council of Agricultural Employers.  Defendants are the U.S. Department of Labor, together with its Employment and Training Administration and its Wage and Hour Division; the Office of the Federal Register; Julie A. Su, in her official capacity as Acting Secretary of Labor; Oliver Potts, in his official capacity as Director of the Office of the Federal Register; José Javier Rodríguez, in his official capacity as Assistant Secretary of Labor for the Employment and Training Administration; and Jessica Looman, in her official capacity as Administrator of the Wage and Hour Division.  At the time the suit was brought, the Secretary of Labor was Martin J. Walsh; the Acting Assistant Secretary of Labor for the Employment and Training Administration was Brent Parton; and Ms. Looman's title was Acting Administrator.

No amici curiae or intervenors participated before the district court.

### B.    Ruling Under Review

Plaintiff seeks review of the district court's opinion (JA996-1024) and order (JA995) denying its motion for summary judgment and granting the government's cross-motion for summary judgment.

**C.**    **Related Cases**

This case has not been before this Court or any court other than the

district court, and we are not aware of any related cases.

                                          */s/ Daniel Winik*
                                          Daniel Winik

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... v

GLOSSARY ............................................................................................ ix

STATEMENT OF THE ISSUE ............................................................... 1

PERTINENT STATUTORY AND REGULATORY PROVISIONS ................ 2

STATEMENT OF THE CASE .................................................................. 2

    A.    The Federal Register Publication Process ....................................... 2

    B.    The Actions At Issue ......................................................... 4

    C.    This Litigation .................................................................... 8

SUMMARY OF ARGUMENT ................................................................ 12

STANDARD OF REVIEW .................................................................... 15

ARGUMENT ....................................................................................... 16

THE DISTRICT COURT CORRECTLY REJECTED PLAINTIFF'S CHALLENGE TO THE 2022 RULE ................................................................. 16

    A.    Because The 2021 Draft Rule Was Not Filed For Public Inspection, The Department Did Not Need Further Notice And Comment Before Issuing The 2022 Rule ............................ 16

    B.    Plaintiff Cannot Prevail By Arguing That OFR Should Have Filed The 2021 Draft Rule For Public Inspection ............. 31

    C.    Even If The 2022 Rule Was Improperly Promulgated, The Relief Plaintiff Seeks Would Be Unwarranted ............................ 39

CONCLUSION .................................................................................... 43

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006)...........................................................33

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993).....................................................41, 42

*Allina Health Services v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014).........................................................40

*Arlington Oil Mills, Inc. v. Knebel*,
543 F.2d 1092 (5th Cir. 1976)...........................................................27

*Carlson v. Postal Regulatory Commission*,
938 F.3d 337 (D.C. Cir. 2019)...........................................................42

*Center for Biological Diversity v. U.S. International Development Finance Corp.*,
77 F.4th 679 (D.C. Cir. 2023).......................................................39, 40

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)..........................................................................33

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015)...........................................................33

*Gill v. Whitford*,
585 U.S. 48 (2018)............................................................................42

*GPA Midstream Association v. U.S. Department of Transportation*,
67 F.4th 1188 (D.C. Cir. 2023)....................................13, 14, 25, 26, 27

*Heartland Regional Medical Center v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009)...........................................................41

*Horsehead Resource Development Co., Inc. v. EPA*,
130 F.3d 1090 (D.C. Cir. 1997).........................................................29

*Humane Society of the United States v. U.S. Department of Agriculture*,
   41 F.4th 564 (D.C. Cir. 2022)............ 4, 12, 18, 19, 20, 21, 22, 23, 24, 25, 26, 29

*Industrial Union Department, AFL-CIO v. Bingham*,
   570 F.2d 965 (D.C. Cir. 1977)....................................................................28, 29

*Kennecott Utah Copper Corp. v. U.S. Department of the Interior*,
   88 F.3d 1191 (D.C. Cir. 1996)........................ 3, 4, 13, 16, 17, 18, 21, 27, 35, 36

*Liquid Energy Pipeline Association v. FERC*,
   109 F.4th 543 (D.C. Cir. 2024)...............................................................13, 14, 26

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   591 U.S. 657 (2020) ................................................................................................39

*McKinney v. Wormuth*,
   5 F.4th 42 (D.C. Cir. 2021)...................................................................................15

*Overdevest Nurseries, L.P. v. Walsh*,
   2 F.4th 977 (D.C. Cir. 2021)...................................................................................5

*Public Citizen v. Burke*,
   843 F.2d 1473 (D.C. Cir. 1988)...........................................................................38

*Robinson v. Department of Homeland Security Office of Inspector General*,
   71 F.4th 51 (D.C. Cir. 2023)................................................................................22

*Stand Up for California! v. U.S. Department of the Interior*,
   879 F.3d 1177 (D.C. Cir. 2018)...........................................................................41

*U.S. Army Corps of Engineers v. Hawkes Co.*,
   578 U.S. 590 (2016) ...............................................................................................21

**Statutes:**

Administrative Procedure Act,
   5 U.S.C. § 704.......................................................................................................21
   5 U.S.C. § 706.......................................................................................................39

Federal Register Act,
Pub. L. No. 74-220, 49 Stat. 500 (1935) ............................................. 2
44 U.S.C. § 1502 ............................................................... 2
44 U.S.C. § 1503 ............................................................... 2
44 U.S.C. § 1507 ...........................................4, 19, 23, 26

8 U.S.C. § 1188(a)(1) ............................................................. 5

44 U.S.C. § 2103(a) ............................................................. 37

**Regulations:**

1 C.F.R. § 17.1 ..................................................................... 3

1 C.F.R. § 17.2 ..................................................................... 3

1 C.F.R. §§ 17.3-17.6 .......................................................... 3

1 C.F.R. § 17.4 ................................................................... 35

1 C.F.R. § 17.6 ................................................................... 35

1 C.F.R. § 17.7 ................................................................... 37

1 C.F.R. § 17.7(a) ..........................................................4, 35

1 C.F.R. § 17.7(b) ............................................................. 36

*Temporary Agricultural Employment of H-2A Nonimmigrants
in the United States*, 84 Fed. Reg. 36,168 (July 26, 2019) ................. 5

*Temporary Agricultural Employment of H-2A Nonimmigrants
in the United States*, 87 Fed. Reg. 61,660 (Oct. 12, 2022) ................ 8

**Other Authorities:**

*Date of 'Promulgation' of Law Enforcement Assistance Administration Regula-
tions*, 1 Op. O.L.C. 12 (1977) .......................................22, 23

National Archives, Federal Register, Jan. 16, 2009,
    https://perma.cc/4E6B-TYVB...................................................................38

National Archives, Federal Register, Jan. 19, 2017,
    https://perma.cc/3BF7-K5ZJ ...............................................................38

National Archives, Federal Register, Jan. 19, 2021,
    https://perma.cc/KB97-FD9F ...............................................................38

National Council of Agricultural Employers, Comment Letter on Proposed
    Rule to Amend Regulations Implementing H-2A Visa Program
    (Sept. 24, 2019), https://perma.cc/8ZPT-2Y46 ..............................................6

Office of the Federal Register, National Archives & Records Administra-
    tion, *Document Drafting Handbook* § 8.8 (Aug. 2018 ed., rev. Oct. 2023),
    https://perma.cc/583D-P87L ...................................................................36

# GLOSSARY

APA                         Administrative Procedure Act

OFR                         Office of the Federal Register

## STATEMENT OF THE ISSUE

In 2019, the Department of Labor issued a proposed rule on which plaintiff, the National Council of Agricultural Employers, commented. In early 2021, in the waning days of the last Administration, the Department transmitted to the Office of the Federal Register (OFR) a draft of a final version of the rule, which it asked OFR to publish as a final rule before the end of the Administration. But given the short time available and the deluge of other publication requests at the end of the Administration, OFR informed the Department that it would be unable to file the draft rule for public inspection, or publish it, by the requested deadline. The Department then posted the draft rule on its website. A few days later, after the change of Administrations, the Department withdrew the draft rule from OFR.

In 2022, the Department published in the Federal Register a final version of the rule. Plaintiff does not dispute that this final rule was a logical outgrowth of the 2019 proposed rule, but it contends that the 2022 rule is invalid because the Department was required to undertake a new round of notice and comment because of its efforts to issue a final rule at the end of the prior Administration. The question is whether the district court correctly declined to hold the 2022 rule invalid on that basis.

## PERTINENT STATUTORY AND REGULATORY PROVISIONS

Pertinent statutory and regulatory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    The Federal Register Publication Process

The federal government takes numerous actions that affect members of the public.  To collect the documents memorializing those actions, and ensure that the public has notice of them, Congress enacted the Federal Register Act in 1935.  Federal Register Act, Pub. L. No. 74-220, 49 Stat. 500 (1935).

As amended over the years, the Act charges "[t]he Archivist of the United States, acting through" OFR, "with the prompt and uniform printing and distribution of the documents required or authorized to be published" in the Federal Register.  44 U.S.C. § 1502.  The Act provides that when documents intended for publication are "filed" with OFR, the Archivist shall note "the day and hour of filing," and that "[u]pon filing," documents intended for publication "shall be available for inspection" by the public.  *Id.* § 1503.  And the Act states that OFR "shall transmit" such documents "immediately to the Government Publishing Office for printing" in the Federal Register. *Id.*

But a document is not "filed" within the meaning of the Act, and thus "made available for public inspection," immediately upon its transmission to OFR.  Rather, statutorily authorized regulations "provid[e] for a 'confidential processing' period to take place *after* an agency transmits a document to the OFR and *before* the OFR makes the document available for public inspection."  *Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior*, 88 F.3d 1191, 1205 (D.C. Cir. 1996).  The regulations state that, "[u]pon receipt" by OFR, "each document shall be held for confidential processing until it is filed for public inspection."  1 C.F.R. § 17.1.

The regulations specify a "regular schedule" for that processing:  In general, documents received "by 2:00 p.m." on a given day will be filed for inspection two business days later and published three business days later. 1 C.F.R. § 17.2.  That schedule can be accelerated in appropriate circumstances.  *Id.* §§ 17.3-17.6 (criteria and procedures for emergency publication and filing for public inspection).  It can also be delayed in appropriate circumstances.  "A document may be assigned to [a] deferred schedule," the regulations provide, if "[t]here are technical problems, unusual or lengthy tables, or illustrations, or the document is of such size as to require

extraordinary processing time." *Id.* § 17.7(a); *see Kennecott*, 88 F.3d at 1205 (OFR "may take longer than three days" when "a document is unusually long").

"The Federal Register Act also sets forth the legal consequences of each step in this process." *Humane Society of the United States v. U.S. Dep't of Agric.*, 41 F.4th 564, 569 (D.C. Cir.), *reh'g denied*, 54 F.4th 733 (D.C. Cir. 2022). "Making a document available for public inspection 'is sufficient to give notice of the contents of the document to a person subject to or affected by it.'" *Id.* (quoting 44 U.S.C. § 1507). A document that requires publication in the Federal Register "'is not valid as against a person who has not had actual knowledge of it until … [it is] made available for public inspection.'" *Id.* (quoting 44 U.S.C. § 1507). "Federal Register publication then 'creates a rebuttable presumption' that the document was 'duly issued, prescribed, or promulgated' and that it was properly 'made available for public inspection at the day and hour stated in the printed notation.'" *Id.* (quoting 44 U.S.C. § 1507).

## B.    The Actions At Issue

This case involves a Department of Labor rule implementing the H-2A visa program, under which employers can hire foreign workers for

- 4 -

temporary agricultural labor. Before an employer can do so, the Department must certify that "there are not sufficient workers who are able, willing, and qualified … to perform the labor or services" in question, and that the employment of foreign workers "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1). The Department "set[s] the parameters of the program" through regulations. *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 980 (D.C. Cir. 2021).

1.    In 2019, the Department proposed a rule to amend the then-current regulations—issued in 2010—for the purpose of "modernizing the H-2A program and eliminating inefficiencies." *Temporary Agricultural Employment of H-2A Nonimmigrants in the United States*, 84 Fed. Reg. 36,168, 36,168 (July 26, 2019). Among other things, the Department proposed to revise the prescribed methodology for determining prevailing wages, *id.* at 36,171, and to increase the size of surety bonds that employers must submit as "proof of [their] ability to discharge [their] financial obligations" under the H-2A program, *id.* at 36,203-36,205.

Within the 60-day comment period, the Department received more than 83,000 comments, including "a 27-page letter submitted by" plaintiff.

JA1000.  In those comments, plaintiff argued (inter alia) that the proposed increase in the size of the required surety bonds would be harmful.  JA35 (plaintiff "explain[ed] the harm that increasing the face value of surety bonds for Farm Labor Contractors would have on the industry"); *see* Nat'l Council of Agric. Emp'rs, Comment Letter on Proposed Rule to Amend Regulations Implementing H-2A Visa Program (Sept. 24, 2019), https://perma.cc/8ZPT-2Y46.

2.    On Monday, January 11, 2021, nine days before the end of the last Administration, the Department transmitted to OFR a document, signed by the relevant Department officials, that it intended for OFR to publish as the final version of the rule proposed in 2019.  JA1000.  The Department also sent OFR a request for "'special handling'" of the draft rule.  *Id.*  It asked that the draft rule be filed for public inspection on January 14 and published on January 15.  JA1000-1001.

On January 14, when it had not heard back from OFR, the Department sent a follow-up message "inquir[ing] into the 'status'" of the draft rule and asking that it be published "'on or before January 19.'"  JA1001.  "Minutes later, an OFR employee responded that, due to the 'relentless backlog of regulatory documents'" submitted in the waning days of the Administration,

"an 'emergency editor' had not yet been able to address [the Department's] submission." *Id.* "Shortly thereafter, another OFR employee replied to inform [the Department] that, '[g]iven [the] backlog,' OFR would 'not be able to file immediately or publish by the 19th.'" *Id.*

The following day, the Department "held a stakeholder call 'regarding significant rulemaking on the H-2A Visa program'" and "issued a press release stating that it had, that day, 'announced a final rule that modernize[d] the H-2A Temporary Agricultural Labor Certification Program.'" JA1001. The press release stated that the Department "would 'publish the final rule in the Federal Register at a later date.'" *Id.* The press release contained a hyperlink to a document that it described as "'the final rule.'" *Id.* When accessed through that hyperlink, the document "contained … at the top of each page" a "disclaimer" stating that it was "'currently pending placement on public inspection at the OFR and publication in the Federal Register'" and that it could "'vary slightly from the published document if minor technical or formatting changes are made during the OFR review process.'" *Id.* The disclaimer emphasized that "'[o]nly the version published in the Federal Register is the official regulation.'" *Id.*

In an email sent on the same day the Department held its stakeholder call and issued its press release, plaintiff's President and CEO stated that the rule was "[l]ikely to be caught up in [the] incoming administration's 60-day regulatory freeze" and that it was "[h]ighly questionable" whether the rule would "see[] the light of day in published form."  JA775.

3.    Shortly after the change of Administrations, the Department "'withdrew'" the proposed publication "from OFR … 'for the purpose of reviewing issues of law, fact, and policy raised by the rule.'"  JA1002.  It also issued a public announcement to that effect.  *See id*.

Some 19 months later, the Department published in the Federal Register a final rule that, among other things, increased the surety bond requirements in a manner consistent with the 2019 proposed rule.  *Temporary Agricultural Employment of H-2A Nonimmigrants in the United States*, 87 Fed. Reg. 61,660 (Oct. 12, 2022); *see id.* at 61,803-61,804.  The rule took effect on November 14, 2022.  JA1002.

### C.    This Litigation

1.    Plaintiff brought this suit shortly after the 2022 rule took effect. JA8-32.  Plaintiff alleged that OFR had acted unlawfully in not publishing the 2021 draft rule and that the Department had acted unlawfully in

withdrawing the 2021 draft rule from OFR and in promulgating the 2022 rule without a further round of notice and comment. JA27-29. Plaintiff also alleged that the 2022 rule was unlawful or arbitrary and capricious in certain substantive respects. JA29-31. Plaintiff sought a declaration that the 2022 rule is invalid, vacatur of the rule, and an injunction against enforcement of the rule, as well as a declaration that OFR's actions constituted "an abuse of its discretion or exceeded its statutory authority." JA31.

2.     Plaintiff sought a preliminary injunction, which the district court denied. The court concluded that plaintiff lacked standing to challenge "the withdrawal of" the 2021 draft rule because "'Plaintiff's own declarations'" established that its "'members were *better off*'" because of the withdrawal. JA792-793. Had the 2021 rule not been withdrawn, the court explained, "'the increased surety bond requirements of which Plaintiff complains would have applied much earlier.'" JA793. The court determined that plaintiff had established standing to challenge the 2022 rule but that it had failed to show the irreparable harm necessary to justify a preliminary injunction. JA797.

3.     The district court then resolved cross-motions for summary judgment in favor of the government. JA996-1024.

The court began by reiterating its prior ruling that plaintiff lacks standing to challenge the withdrawal of the 2021 draft rule because plaintiff "failed to show 'that any of its members suffered an injury in fact from the withdrawal.'" JA1008. For essentially the same reason, the court concluded that plaintiff also lacks standing to challenge OFR's handling of the 2021 draft rule. JA1009-1011.

The court concluded that plaintiff did establish standing to challenge the 2022 rule, "at least insofar" as the rule raised "the surety bond requirements." JA1014. But on the merits, the court rejected plaintiff's challenge to the rule. Plaintiff "does not dispute," the court noted, "that the modifications to the 2019 [proposed rule] that are reflected in the 2022 Rule are a 'logical outgrowth' of the initial proposal." JA1016. Plaintiff's argument thus rests entirely on the proposition "that the 2021 Rule—not the 2022 Rule—marked the culmination of the rulemaking process that began with the 2019" proposal, such that the Department was required to undertake a new round of notice and comment before issuing the 2022 rule. JA1017.

Because "there is no dispute that the 2021 Rule did not pass the finality threshold established by" this Court's precedent—namely, being filed for public inspection—the court explained that plaintiff must rely on its

- 10 -

alternative theory "that the 2021 Rule was nonetheless a final rule because it was 'final and conclusive' and because 'notice' of the rule was 'provided to the public.'"  JA1019.  The court found that theory "unpersuasive for multiple reasons."  *Id.*  First, the court explained, this Court's decision in *Kennecott* establishes that the transmission to OFR of a draft rule signed by the relevant agency officials "do[es] not suffice to show that a rule is 'final' in the sense that it may not be withdrawn without notice-and-comment."  JA1020.  And second, the court found that conclusion to be "consistent with the … statutes and regulations governing the" Federal Register process, which make clear that during the period between the transmission of a draft rule to OFR and OFR's filing of the draft rule for public inspection, the agency may "not only … 'correct mistakes' in the rule" but "also 'withdraw' the rule from publication entirely."  JA1021.

The court noted that plaintiff "also argue[d] that the 2021 Rule became final because the public was on 'notice' of the rule," but it explained that the facts here cannot "be fairly construed to deem the public 'on notice' of the fact that the 2021 Rule was a final rule."  JA1022.  That was true, the court explained, because of the disclaimer in the draft rule that the Department posted online, because "nothing would have prevented agency officials"

from making "substantive changes" to the rule before it was filed for public inspection, and because "the record suggests that [plaintiff] itself was doubtful that the 2021 Rule represented [the Department's] final word on the matter." JA1023.

## SUMMARY OF ARGUMENT

Plaintiff had a full opportunity to comment on the 2019 proposed rule, and the 2022 rule was undisputedly a logical outgrowth of that proposed rule. Plaintiff nonetheless contends that the 2022 rule is invalid because the Department was required to conduct a new round of notice and comment after the online posting of the 2021 draft rule. That is incorrect. Because the draft rule was never filed for public inspection by OFR, the Department was not required to conduct a new notice-and-comment process before issuing the 2022 rule.

A.    In *Humane Society of the United States v. U.S. Department of Agriculture*, 41 F.4th 564 (D.C. Cir.), *reh'g denied*, 54 F.4th 733 (D.C. Cir. 2022), this Court held that an agency was required to provide notice and an opportunity to comment before withdrawing a rule that had been filed for public inspection. But the draft rule here was never filed for public inspection.

Plaintiff gives two reasons why, in its view, the Department nonetheless could not withdraw the draft rule, and promulgate a new version of the rule, without an additional round of notice and comment.  The first is that the draft rule was signed by Department officials and transmitted to OFR.  But that argument is foreclosed by *Kennecott Utah Copper Corp. v. U.S. Department of the Interior*, 88 F.3d 1191 (D.C. Cir. 1996), which makes clear that the signing of a draft rule by agency officials and the transmission of the draft rule to OFR, without more, do not prevent the agency from withdrawing the draft rule and later issuing a new version without further notice and comment.

Plaintiff also argues that the Department was required to undertake a new round of notice and comment before promulgating the 2022 rule because it posted the 2021 draft rule on its website and shared its content with certain stakeholders on a phone call.  That argument is not formally foreclosed by *Kennecott* or *Humane Society*, but it is inconsistent with the reasoning of *Humane Society*.  Indeed, in two subsequent cases, *GPA Midstream Association v. U.S. Department of Transportatio*n, 67 F.4th 1188 (D.C. Cir. 2023), and *Liquid Energy Pipeline Association v. FERC*, 109 F.4th 543 (D.C. Cir. 2024), this Court read *Humane Society* to mean that "[u]ntil" a rule "is filed for

public inspection," it "may be withdrawn without explanation or notice and comment and is 'not valid' and enforceable against the public at large." *GPA Midstream*, 67 F.4th at 1195; *see Liquid Energy*, 109 F.4th at 548.

In any event, this case does not require the Court to pass definitively on whether the public posting on a website of a rule characterized as the agency's final work product would prevent the agency from withdrawing the rule before it is filed for public inspection. That is because, as the district court explained, the draft rule that the Department posted publicly in this case was *not* characterized as the agency's final work product. The Department included a disclaimer on every page of that document, making clear that the document was a draft and that only the version published in the Federal Register would constitute the final rule. Plaintiff's own president and CEO made clear that he did not expect the 2021 draft rule to take effect.

B.    Plaintiff cannot evade this result by arguing that OFR should have filed the 2021 draft rule for public inspection. As the district court concluded, plaintiff lacks standing to challenge OFR's failure to post the draft rule for public inspection, or publish it in the Federal Register, because plaintiff cannot show that it or any of its members were harmed by that conduct. Even if plaintiff or its members had been injured by OFR's inaction, that

injury would not be redressable by the relief that plaintiff seeks. And even if plaintiff's arguments with respect to OFR were jurisdictionally proper, they are meritless. OFR's handling of the exceptionally long draft rule, submitted amid a crush of other publication requests at the end of a presidential term, was wholly consistent with its governing statute and regulations.

C.    In any event, even if the 2022 rule were improperly promulgated, plaintiff would not be entitled to the relief it seeks. Plaintiff cannot show that it was prejudiced by the lack of a new comment period because it commented extensively on the 2019 proposed rule, from which the 2022 rule was undisputedly a logical outgrowth. Even if plaintiff were prejudiced, remand without vacatur of the 2022 rule would be appropriate. And to the extent any vacatur were warranted, it could extend only to those portions of the rule as to which plaintiff established standing (and any other portions that could not be severed from those portions).

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of summary judgment de novo." *McKinney v. Wormuth*, 5 F.4th 42, 45 (D.C. Cir. 2021) (per curiam).

- 15 -

# ARGUMENT

## THE DISTRICT COURT CORRECTLY REJECTED PLAINTIFF'S CHALLENGE TO THE 2022 RULE

As noted above, plaintiff had ample opportunity to comment on the 2019 proposed rule, of which all agree that the 2022 rule was a logical outgrowth. That would typically mean the 2022 rule satisfies the notice-and-comment requirement. Plaintiff argues, however, that the signing, transmission to OFR, and public posting of the 2021 draft rule required the Department to undertake a new round of notice and comment before issuing the 2022 rule. That is incorrect—and even if it were correct, the relief plaintiff seeks would be unwarranted.

### A. Because The 2021 Draft Rule Was Not Filed For Public Inspection, The Department Did Not Need Further Notice And Comment Before Issuing The 2022 Rule

1. In two cases, this Court has addressed the issue presented here: the point at which an agency lacks the authority to withdraw a draft rule subject to notice-and-comment requirements, and ultimately issue a revised version of the rule, without conducting a new notice-and-comment process.

a. In *Kennecott Utah Copper Corp. v. U.S. Department of the Interior*, 88 F.3d 1191 (D.C. Cir. 1996), the Court held that the Interior Department had lawfully withdrawn a document that—like the 2021 draft rule in this case—

had been signed by agency officials and transmitted to OFR for processing but had never been filed for public inspection.  There, as here, the agency had transmitted a draft rule to OFR shortly before a new Administration took office.  *Id.* at 1200.  There, as here, the agency withdrew the draft rule from OFR immediately after the change of Administrations.  *Id.* at 1200-1201.  There, as here, the agency later published a final version of the rule.  *Id.* at 1201.  And there, as here, challengers argued that OFR had been required to publish the draft rule before the change of Administrations, that the agency was required to provide notice and allow comment before withdrawing the draft rule, and that the subsequent promulgation of a final rule was accordingly unlawful.  *Id.* at 1201-1202.

This Court rejected those arguments.  Two points from its analysis are relevant here.  First, the Court concluded that OFR had not violated the Federal Register Act or its regulations when it did not publish the draft rule before the change of Administrations.  The Court explained that the Act "says nothing" to preclude OFR from "allow[ing] an agency to withdraw [a] document during" a period of "confidential processing" before a document is "ma[de] … available to the public."  88 F.3d at 1206.  "[P]ermitting agencies to correct mistakes and even to withdraw regulations until virtually the last

minute before public release," the Court noted, "helps assure that regulations appearing in the Federal Register are as correct as possible in both form and substance." *Id.*

Second, the Court held that the withdrawn draft rule "never became a binding rule requiring repeal or modification," such that the later final rule was procedurally valid without a further round of notice and comment. *Id.* at 1208. The Court specifically rejected the argument that "whenever agencies propose rules, receive comments from the public, and internally approve a draft version of the final regulations," agencies are precluded "from discarding those documents without again requesting public comment." *Id.* The Court found "nothing in the text of the [Administrative Procedure Act (APA)], its legislative history, or case law suggesting that Congress intended such an unlikely result." *Id.*

b.   The second key case is *Humane Society of the United States v. U.S. Department of Agriculture*, 41 F.4th 564 (D.C. Cir.), *reh'g denied*, 54 F.4th 733 (D.C. Cir. 2022). Like *Kennecott* and this case, *Humane Society* involved a draft rule that had been transmitted to OFR at the end of a presidential Administration and withdrawn at the beginning of the next one—but unlike in *Kennecott* and this case, the draft rule in *Humane Society* had been filed for

public inspection by OFR.  The question was whether the agency was required to "provide notice and an opportunity for comment" before "withdrawing [the] rule" because it "ha[d] been filed for public inspection," or whether that obligation did not attach because the rule had not yet been "published in the Federal Register."  *Id.* at 565.

The majority of a divided panel held that the filing of the rule for public inspection precluded the agency from withdrawing it without notice and comment.  The majority reasoned that, under the Federal Register Act, the point at which a rule becomes valid and enforceable "against the public at large"—as opposed to only those with actual notice of the rule—is the point when it "is filed for public inspection" by OFR.  *Id.* at 570; *see id.* at 569 ("[m]aking a document available for public inspection 'is sufficient to give notice of the contents to a person subject to or affected by it,'" allowing enforcement of the document even "'against a person who has not had actual knowledge of it'" (quoting 44 U.S.C. § 1507)).  Because "[m]aking a rule available for public inspection … carries legal consequences," the majority identified "the date a rule is filed for public inspection" as "the critical date" past which it cannot be withdrawn without notice and comment.  *Id.* at 570.

Judge Rao, who dissented, would have held that even the filing of the rule for public inspection did not trigger a notice-and-comment obligation. *Id.* at 575-576 (Rao, J., dissenting).  She expressed the view that "publication" in the Federal Register, not filing for public inspection, "determines the adoption, finality, and effectiveness of a substantive rule."  *Id.* at 576.  Judge Rao drew that inference from the "holding and logic" of *Kennecott*, the premise of which was that "the withdrawn rule" "'never became a binding rule requiring repeal or modification'" "because it was never published."  *Id.* at 577.

2.     In this case, the 2021 draft rule was never filed for public inspection, so *Humane Society* does not dictate the conclusion that the Department was required to provide an additional round of notice and comment before issuing the 2022 rule.  Plaintiff nonetheless argues that the Court should adopt that conclusion for essentially two reasons.  Neither has merit.

a.     Plaintiff first contends that the 2021 draft rule became final because two "principal officers" of the Department "signed" it and "submitted it to OFR."  Br. 22; *see also, e.g.*, Br. 16-18, 21.  But as the district court recognized, that argument is flatly contrary to *Kennecott*.  There, as here, the draft rule had been "'signed' by the relevant" agency official and transmitted to

OFR, at the direction of "a high-ranking … official," "'for publication as [a] final regulation[].'"  JA1020 (quoting *Kennecott*, 88 F.3d at 1200).  But "[d]espite these facts," this Court "explained that the document sent to OFR … had 'never bec[o]me a binding rule.'"  *Id.* (quoting *Kennecott*, 88 F.3d at 1208).

Plaintiff's argument appears to rely principally on the body of law governing which agency actions are sufficiently "final" to be judicially reviewable under 5 U.S.C. § 704.  *See, e.g.*, Br. 16, 19 (citing *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016)).  But as this Court recognized in *Humane Society*, "decisions addressing when a rule becomes final for purposes of judicial review" are "unrelated to when notice-and-comment requirements attach."  41 F.4th at 574.  No one doubts that, if the 2021 draft rule had actually been issued, it would have been final within the meaning of § 704 and thus reviewable.  But the same was true of the draft rule in *Kennecott*.  As that decision teaches, the fact that a draft rule would constitute final agency action *if actually issued* does not mean the agency lacks power to withdraw and revise it, without a new round of notice and comment, if it has not yet been published or even filed for public inspection by OFR.

To the extent plaintiff argues (Br. 20) that *Humane Society* "overruled" *Kennecott*, that is incorrect for two reasons.  First, a panel "'cannot overrule

a prior panel's decision, except via an *Irons* footnote or en banc review,'" neither of which happened in *Humane Society*. *Robinson v. Department of Homeland Sec. Office of Inspector Gen.*, 71 F.4th 51, 56 n.1 (D.C. Cir. 2023). Second, nothing in *Humane Society* is at all inconsistent with the relevant holding of *Kennecott*: that the signing of a draft rule by the relevant agency officials, and the transmission of the draft rule to OFR, do not (without more) prevent the agency from withdrawing the draft rule and issuing a new version without further notice and comment.

Nor does it help for plaintiff to invoke (Br. 22) a two-paragraph opinion of the Office of Legal Counsel, *Federal Register Act — Date of 'Promulgation' of Law Enforcement Assistance Administration Regulations*, 1 Op. O.L.C. 12 (1977). As *Humane Society* explains, 41 F.4th at 570, that opinion — like a 1935 opinion of the Attorney General that preceded it — stands only for the proposition (consistent with the majority opinion in *Humane Society*) that a rule can be valid and effective against the general public without having been published. The opinion does not conclude that the mere submission of a draft rule to OFR, as opposed to the filing of the draft rule for public inspection, makes it valid and enforceable. To the contrary, it refers to the importance of "constructive notice to persons subject to or affected by the

regulation." 1 Op. O.L.C. at 12. As *Humane Society* explains, it is the filing of a draft rule for public inspection—not the mere submission of the draft rule to OFR, or the public posting of the draft rule on an agency website—that places the public on constructive notice. 41 F.4th at 569. Even if many people acquire actual notice of a draft rule from viewing a publicly posted version of it on a website, the Federal Register Act expressly specifies that a document requiring publication in the Federal Register "'is not valid as against a person who has not had actual knowledge of it'"—in other words, there has been no constructive notice—"'until … [it is] made available for public inspection'" by OFR. *Id.* (quoting 44 U.S.C. § 1507).

Finally, plaintiff's invocation (Br. 23-24) of the text of the Federal Register Act is unpersuasive. It is certainly true, as plaintiff infers from §§ 1501 and 1503, that an executive action can sometimes be "issued or promulgated" before it is transmitted to OFR. Executive orders, for example, can be issued by the President and only later published in the Federal Register. But nothing in the cited statutory language suggests that whenever the relevant agency officials have signed a draft rule and transmitted it to OFR, they have thereby issued or promulgated the rule in a sense that deprives the agency of the power to withdraw the rule from publication and then issue a revised

version of it without a new round of notice and comment.  Again, *Kennecott* says exactly the opposite.

b.    Plaintiff's other argument is that the Department was required to undertake a new round of notice and comment before issuing the 2022 rule because it posted the 2021 draft rule on its website and shared the draft rule's content with certain stakeholders on a phone call.  That argument is not formally foreclosed by *Kennecott* or *Humane Society*.  In *Humane Society*, the Court did not reach the plaintiff's "alternative argument" that the draft rule in question had crossed the threshold of being no longer withdrawable when it had been "posted" on the agency's "website" before it was filed for public inspection.  41 F.4th at 575.

But the argument is clearly inconsistent with the reasoning of *Humane Society*.  That decision describes "the date a rule is filed for public inspection" as "*the* critical date" for purposes of the issue presented here and in that case: when the process of issuing a rule has crossed the threshold beyond which the rule is out of the agency's hands and can no longer be withdrawn and revised without a new round of notice and comment.  41 F.4th at 570 (emphasis added).  And the reason the Court considered that date to be "critical" was that it was the point at which "a rule becomes 'valid' against the public

- 24 -

at large." *Id.* Before that point, as noted above, a rule is valid and enforceable only "against parties with actual notice." *Id.* at 570-571. Although the Court observed that it did not "have occasion to decide when APA procedures attach to rules not yet on public inspection but enforceable against those with actual notice," *id.* at 575, the Court's reasoning does not leave much doubt that such rules can be withdrawn from publication, and revised without further notice and comment, because they are not yet binding on the regulated public.

To the extent *Humane Society* left any doubt on that score, the Court has resolved it in two subsequent cases. First, in *GPA Midstream Association v. U.S. Department of Transportatio*n, 67 F.4th 1188 (D.C. Cir. 2023), the Court considered whether a petition for review of a highway safety standard was timely, which turned on when the standard was "'established authoritatively.'" *Id.* at 1195. The Court explained that "[a] legislative rule is established authoritatively when it is duly fixed and so becomes binding on the public," emphasizing that that does not happen "at least until [the rule] is filed for public inspection." *Id.* "*Until then,*" the Court wrote, the rule "may be withdrawn without explanation or notice and comment and is 'not valid'

and enforceable against the public at large." *Id.* (emphasis added) (quoting 44 U.S.C. § 1507, and citing *Humane Society*, 41 F.4th at 575).

Second, in *Liquid Energy Pipeline Association v. FERC*, 109 F.4th 543 (D.C. Cir. 2024), the Court considered whether an agency could "rehear[]" one of its prior determinations without notice and comment. *Id.* at 546. The Court described *Humane Society* as having "held," "[o]utside the context of agency rehearing proceedings," "that once an agency's rule is '"valid" against the public at large,' the APA generally requires the agency to afford notice-and-comment procedures before amending the rule." *Id.* at 548 (quoting *Humane Society*, 41 F.4th at 570).

*GPA Midstream* and *Liquid Energy* thus confirm that the point beyond which an agency cannot withdraw its draft rule from publication, and then issue a revised version of the rule without further notice and comment, is the point at which the rule becomes "'"valid" against the public at large,'" *Liquid Energy*, 109 F.4th at 548—in other words, the point when it is "is filed for public inspection," *GPA Midstream*, 67 F.4th at 1195. "Until then," *GPA*

*Midstream* states expressly, the rule "may be withdrawn without explanation or notice and comment." *Id.*[1]

The holding that plaintiff advocates here—that an agency loses authority to revise a draft rule (without a new round of notice and comment) once it posts the draft rule on its website or shares it with certain stakeholders—would be inconsistent with the objectives of the OFR review process. As this Court explained in *Kennecott*, the period of "confidential processing" established by regulations under the Federal Register Act serves an important purpose: "[P]ermitting agencies to correct mistakes and even to withdraw regulations until virtually the last minute before public release … helps assure that regulations appearing in the Federal Register are as correct as possible in both form and substance." 88 F.3d at 1206. But under plaintiff's

---

[1] Because this Court has addressed the relevant issues in *Kennecott*, *Humane Society*, *GPA Midstream*, and *Liquid Energy*, the Fifth Circuit's 48-year-old decision in *Arlington Oil Mills, Inc. v. Knebel*, 543 F.2d 1092 (5th Cir. 1976), sheds little relevant light. In any event, that decision does not address a comparable fact pattern. It concerned an announcement of price-support adjustments, and a subsequent announcement reconsidering the first one, where neither the first nor the second announcement was submitted to OFR for publication in the Federal Register. So the Fifth Circuit had no occasion to address the relevant question here and in this Court's other cases, which is the *point in the publication process* at which an agency loses the power to withdraw a rule from publication and later issue a revised version without a new round of notice and comment.

apparent theory, that period would be eliminated if even a single member of the public glimpsed a document that had been signed by agency officials and transmitted to OFR for review. And to the extent plaintiff might suggest that what matters is the extent of the draft rule's distribution, it is difficult to imagine how that standard could be administered. What proportion of the regulated public would need to see a publicly posted draft rule—and thus be subject to potential enforcement of it—for the rule no longer to be withdrawable? And how would one even know what proportion of the regulated public had seen a publicly posted draft?

Plaintiff does not help its cause by invoking the opinion of a single judge in *Industrial Union Department, AFL-CIO v. Bingham*, 570 F.2d 965 (D.C. Cir. 1977) (per curiam), which plaintiff mistakenly characterizes as an opinion of "[t]he court" (Br. 30). That opinion, as assertedly relevant (Br. 29-31), stands for the proposition that "disclosure to the general public is not necessary to make agency action ripe for judicial review"; rather, a party who has actual notice of an agency's action—and thus is bound by the action—can challenge the action in court without waiting for it to be published to the population at large. *Id.* at 968-971 (opinion of Leventhal, J.). A second member of the panel agreed with that conclusion, but without joining Judge

Leventhal's opinion. *See id.* at 976-979 (opinion of Fahy, J.); *see also Horsehead Res. Dev. Co., Inc. v. EPA*, 130 F.3d 1090, 1094 (D.C. Cir. 1997) (discussing the "sharply-splintered" set of opinions in *Bingham*). But even if Judge Leventhal's opinion were actually an opinion of the Court, it falls within a line of opinions addressing the question of "when a rule becomes final for purposes of judicial review," which is "unrelated to when notice-and-comment requirements attach." *Humane Society*, 41 F.4th at 574. Nothing in its reasoning suggests that an agency lacks the authority to withdraw a draft rule, and then issue a revised version of it without further notice and comment, after sharing it with any member of the public. On the question of when a rule can be withdrawn and revised without further notice and comment, *Humane Society* (as construed in *GPA Midstream* and *Liquid Energy*) makes clear that the "critical date" is when the public at large is on constructive notice of the rule—that is, when it is filed for public inspection by OFR. *Id.* at 570.

In any event, the Court need not address whether the public posting of a document characterized as the final version of a rule would prevent the agency from withdrawing the rule before it is filed for public inspection. To the extent the Court perceives that question as open, it can simply reserve the question, because in this case, the version of the draft rule that the

Department posted on its website was *not* characterized as the agency's final work product. As the district court observed, "[t]he fundamental difficulty" with plaintiff's contrary argument is that the publicly posted draft rule "contained a disclaimer explicitly stating that" it was not "'the official regulation'" and could "'vary slightly from the published document if minor technical or formatting changes are made during the OFR review process.'" JA1022-1023. The court correctly noted that "the meaning and effect of a statute or regulation" can be "substantially altere[d]" by changes, such as the addition or deletion of a comma, that one might describe as "'technical.'" JA1023. And "even though the disclaimer only referred to 'technical or formatting changes,'" the court correctly observed that "nothing would have prevented agency officials from enacting larger, more substantive changes" before the rule was "posted for public inspection." *Id.*

As the record shows, that concern was well understood by interested members of the regulated public: Plaintiff's own "president and CEO observed," on "the day that [the Department] posted the rule to its website," that the rule "was '[l]ikely to be caught up in [the] incoming administration's 60-day regulatory freeze' and that it was therefore '[h]ighly questionable' that the rule would 'see[] the light of day' in its present form." JA1023. That

real-time analysis from plaintiff's own leadership fatally undercuts plaintiff's theory that the public posting of the draft rule sufficiently solidified it in the minds of regulated entities as to deprive the agency of the power to withdraw and revise it without an additional round of notice and comment.

### B.   Plaintiff Cannot Prevail By Arguing That OFR Should Have Filed The 2021 Draft Rule For Public Inspection

Given the difficulty of arguing that the Department was not allowed to withdraw and revise the 2021 draft rule, even though the draft rule had not yet been filed for public inspection, plaintiff also tries an alternative theory: that OFR acted unlawfully by not filing the draft rule for public inspection within the time available before the new Administration took office. But that argument is not jurisdictionally proper, and it would fail on the merits even if it were.

1.    As the district court concluded, plaintiff lacks standing to challenge OFR's failure to post the draft rule for public inspection, or publish it in the Federal Register, because plaintiff cannot show that it or any of its members were harmed by that conduct. For the same reason, plaintiff lacks standing to challenge the Department's withdrawal of the draft rule, as

distinct from the Department's eventual issuance of a revised version of the rule.

The effect of OFR's inaction and the Department's withdrawal of the draft rule was that, during the nearly two-year period between the withdrawal of the 2021 draft rule and the ultimate effective date of the 2022 final rule, plaintiff's members were governed by the terms of the prior rule (issued in 2010) rather than by the terms of the 2021 draft rule. And as plaintiff's "own declarations established," plaintiff's "'members were *better off*'" under that state of the world than they would otherwise have been. JA1008. That is because, had OFR published the 2021 draft rule, "'the increased surety bond requirements of which [plaintiff] complains would have applied much earlier.'" *Id.*; *see* JA1009.

The district court correctly rejected various arguments that plaintiff itself, as opposed to its members, was harmed by OFR's inaction with respect to the 2021 draft rule. JA1009-1010. The court noted that plaintiff had not cited, and the court was not aware of, "authority for the proposition that an organization's mere preference for one rule over another is sufficient to satisfy the injury-in-fact requirement of Article III standing." JA1010. The court described as "purely hypothetical," and unsupported by "any evidence,"

plaintiff's argument that "there likely would have been no need for [it] to bring this lawsuit" had OFR published the 2021 draft rule. *Id.* (emphasis omitted). And even if that supposed injury were "based in fact (as opposed to conjecture) and supported by evidence," the court explained, it "is not the type of injury that would give [plaintiff] standing to sue," JA1010-1011, given this Court's holdings that "an organization's use of resources for litigation … is not sufficient to give rise to an Article III injury," *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *see Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (similar). Plaintiff's lack of organizational standing has only become clearer since the district court issued its decision, with the Supreme Court's holding that an organization cannot establish standing by showing that it "divert[ed] its resources in response to a defendant's actions." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

Even if plaintiff or its members had been injured by the nonpublication of the 2021 draft rule, moreover, that injury would not be redressable by the relief that plaintiff seeks. As discussed above, the effect of OFR's conduct and the Department's withdrawal of the draft rule was that, instead of the draft rule's taking effect as a final rule in early 2021, plaintiff's members

remained governed by the 2010 rule until it was eventually replaced by the 2022 rule.  The relief for that injury, in concept, would be a judicial decree imposing the 2021 draft rule as a final rule.  That relief would be improper for many reasons, but for present purposes, the only salient point is that plaintiff *disavows* any such form of relief.  As it did in the district court, plaintiff goes out of its way to note here that it is not seeking an "order" for the government "to now publish the 2021 Rule."  Br. 26 n.6.  Plaintiff's desire to avoid the imposition of the 2021 draft rule makes its insistence that that rule became final—such that it could not be revised without further notice and comment—all the more extraordinary.

The relief plaintiff actually does seek—an order "set[ting] aside the 2022 Rule and requir[ing the Department] to revert to the *status quo ante*" (Br. 35)—would by no means redress any injury supposedly arising from OFR's inaction with respect to the 2021 draft rule or from the Department's withdrawal of that rule.  It would do the exact opposite.  The effect of OFR's and the Department's conduct, as discussed above, was to leave the 2010 rule in place.  The relief that plaintiff now seeks is the restoration of the 2010 rule.  So rather than redressing the effect of OFR's and the Department's conduct, that relief would repeat the effect of that conduct.

Because plaintiff lacks standing to challenge OFR's nonpublication of the 2021 draft rule (and the Department's withdrawal of that draft rule before OFR filed it for public inspection), the Court's analysis of the validity of the 2022 rule should simply take as a given that the 2021 draft rule was not filed for public inspection by OFR. This would not be a proper context in which to entertain plaintiff's arguments that OFR *should* have filed the 2021 draft rule for public inspection.

2.    In any event, plaintiff's arguments that OFR acted unlawfully are meritless. As this Court recognized in *Kennecott*, the regulations governing the OFR process make clear that publication "may take longer than three days" when "a document is unusually long." 88 F.3d at 1205. The regulations state explicitly that "[a] document may be assigned to [a] deferred schedule" if "[t]here are technical problems, unusual or lengthy tables, or illustrations, or the document is of such size as to require extraordinary processing time." 1 C.F.R. § 17.7(a). And unlike with emergency accelerations of the publishing schedule, for which the regulations lay out particular procedures, *id.* §§ 17.4, 17.6, the regulations prescribe no particular procedure for the assignment of a document to a deferred schedule. They state only

that OFR "staff will notify the agency if its documents must be assigned to a deferred schedule." *Id.* § 17.7(b).

That is in substance what happened here. As publicly posted by the Department, the draft rule was 722 pages long. JA52-773. Even among federal regulations (not always models of brevity), this one was "unusually long"—exactly the sort of document that might "take longer than three days" to publish even under ordinary circumstances. *Kennecott*, 88 F.3d at 1205. Indeed, OFR's Document Drafting Handbook—which plaintiff cites (Br. 27-28)—states categorically that "a document of 100 double-spaced pages or more requires additional time." OFR, Nat'l Archives & Records Admin., *Document Drafting Handbook* § 8.8 (Aug. 2018 ed., rev. Oct. 2023), https://perma.cc/583D-P87L.

And the closing days of an Administration are anything but ordinary circumstances. As the recurrence of this fact pattern in *Kennecott*, *Humane Society*, and now this case makes clear, agency officials routinely try to ensure that actions consistent with the policy priorities of an outgoing Administration are taken before the President's term in office ends, and that effort unsurprisingly leads to an eleventh-hour crush of activity. The end of the last Administration was no exception, as is clear from an OFR employee's

reference to a "'relentless backlog of regulatory documents'" in an email sent on January 14, 2021.  JA1001.

Especially in light of the extraordinary length of the draft rule—more than seven times the length of documents that, according to OFR's hand-book, categorically require additional processing time—it is entirely unsur-prising for OFR to have "inform[ed] [the Department] that, '[g]iven [the] backlog,' OFR would 'not be able to' file [the draft rule] immediately or pub-lish by the'" end of the Administration.  JA1001.  That communication was exactly what OFR's regulations contemplate: a "notif[ication]" from OFR "staff" to "the agency" that its proposed publication needed to be "assigned to a deferred schedule," 1 C.F.R. § 17.7.

There is no basis for plaintiff's accusation (Br. 35) that OFR, as "a divi-sion of an independent agency," was "unilaterally[] and without oversight setting the regulatory agenda for the United States" by "ignor[ing] or declin[ing] to follow the requests of principal officers of the United States." As an initial matter, OFR is not insulated from oversight by the President. The Archivist of the United States, who oversees OFR as a component of the National Archives and Records Administration, serves at the pleasure of the President.  44 U.S.C. § 2103(a) ("The Archivist may be removed from office

by the President."); *see Public Citizen v. Burke*, 843 F.2d 1473, 1476 n.1 (D.C. Cir. 1988) (similar). And OFR is subject to executive orders issued by the President.

Moreover, there is no evidence that OFR was, as plaintiff insinuates, trying to undermine the policy priorities of the outgoing Administration in January 2021. The January 19, 2021 issue of the Federal Register—the last issue of that Administration—included 166 documents from 57 agencies, including 32 rules. *See* Nat'l Archives, Federal Register, Jan. 19, 2021, https://perma.cc/KB97-FD9F. The number of rules published in that final issue of the Administration is closely comparable to the figure for the prior Administration (35 rules published on January 19, 2017) and the one before that (35 rules published on January 16, 2009). *See* Nat'l Archives, Federal Register, Jan. 16, 2009, https://perma.cc/4E6B-TYVB; Nat'l Archives, Federal Register, Jan. 19, 2017, https://perma.cc/3BF7-K5ZJ. Those figures reflect an agency whose dedicated civil servants were doing their best to accommodate a large influx of publication requests during the time and with the resources available—not acting as "rulemaking kings" (Br. 10) worthy of plaintiff's criticism.

### C.    Even If The 2022 Rule Was Improperly Promulgated, The Relief Plaintiff Seeks Would Be Unwarranted

In any event, even if this Court were to conclude that the Department was required to provide notice and an opportunity for comment between the withdrawal of the 2021 draft rule and the promulgation of the 2022 rule, the relief plaintiff seeks—a remand "with instructions to set aside the 2022 Rule and require [the Department] to revert to the *status quo ante*" (Br. 35)—would be unwarranted for three reasons.

*First*, plaintiff cannot show that it was prejudiced by the lack of a new comment period.  The APA requires courts reviewing agency action to take "due account … of the rule of prejudicial error," 5 U.S.C. § 706, and the Supreme Court has treated that provision "as an 'administrative law … harmless error rule,'" *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 684 (2020).  An APA plaintiff therefore cannot obtain relief without "show[ing] that an error is harmful."  *Center for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023).  And plaintiff cannot possibly make that showing, given that it provided extensive comments on the 2019 proposed rule, from which the 2022 rule was undisputedly a logical outgrowth.  Plaintiff does not and cannot explain how it

was adversely affected by the inability to submit an additional round of comments on the proposed rule from which the challenged rule emanated.

It is true that this Court has not "[g]enerally … 'been hospitable to [] claims of harmless error in cases'" where an agency failed to provide notice. *Center for Biological Diversity*, 77 F.4th at 690 (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014)).  But that rule is not invariable. *See id.* ("[E]rror can be harmless if notice-and-comment would not alter the legal conclusion of the rule.").  And this case does not fall within any of the categories of cases where an agency's failure to provide notice is most evidently harmful—namely (1) "cases in which a government agency seeks to promulgate a rule by another name," (2) "cases in which an agency has relied on data or information that was not disclosed to commenters," and (3) cases where the final rule "is not a logical outgrowth of the proposed rule." *Allina*, 746 F.3d at 1109-1110.  Indeed, even in that last category of cases, where the final rule "is not a logical outgrowth of the proposed rule," the Court has recognized the error "might well be properly regarded as … harmless" if parties actually "directed comments to" the content of the final rule—and the Court has noted that if a challenger to the rule "itself made such a comment, it would presumably be hoist on its own petard." *Id.* at 1110.  That is

exactly the case here: Having commented on the 2019 proposal that became the 2022 rule, plaintiff could not seriously argue that it was prejudiced by the Department's failure to invite it to do so for a second time.

*Second*, even if plaintiff could somehow show that the Department's error was prejudicial, it would not be proper for the 2022 rule to be vacated. Although notice-and-comment violations "'normally' require[] vacatur of the rule" under this Court's precedent, *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009), this case—as noted above—does not fall within any of the usual categories of cases in which this Court has regarded such violations as problematic. To the contrary, the Department received extensive comments on a proposed rule from which the challenged rule is undisputedly a logical outgrowth. That is exactly the situation—where the agency has made its determination "after considerable participation from multiple stakeholders"—in which it is most obviously likely that the agency "would 'reach the same conclusion and reinstitute the same action'" after a further round of notice and comment. *Stand Up for California! v. U.S. Dep't of the Interior*, 879 F.3d 1177, 1191 (D.C. Cir. 2018). Even "a serious possibility" of that outcome can justify remand without vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993). And remand

without vacatur would be especially appropriate here given the "quite disruptive" "consequences" of vacatur, *id.*, including the risk of harm to workers who would no longer be protected by surety bonds that are sufficient to cover the wages they are owed.

*Finally*, even if plaintiff could establish prejudicial error and even if vacatur could be appropriate under this Court's precedent, any such vacatur could extend only to the portions of the 2022 rule that plaintiff demonstrated standing to challenge, and not to any portions of the rule that are severable. *See, e.g.*, *Gill v. Whitford*, 585 U.S. 48, 73 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) ("the APA permits a court to sever a rule by setting aside only the offending parts of the rule," as long as "'the agency would have adopted the same disposition regarding the unchallenged portion [of the regulation] if the challenged portion were subtracted'" and "the parts of the regulation that remain" can "'function sensibly without the stricken provision'"). In this case, the district court did not address the government's argument that plaintiff lacked standing to challenge portions of the 2022 rule aside from the surety-bond provisions, because doing so was unnecessary given the district court's conclusion "that

the 2022 Rule *was* properly promulgated." JA1014. If this Court were to reverse that conclusion—and if it were to conclude that vacatur of the rule could be warranted, notwithstanding the arguments above—then on remand, the district court would need to address plaintiff's standing as to the other portions of the rule and limit any vacatur accordingly.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

CHARLES W. SCARBOROUGH

 */s/ Daniel Winik*
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*
  *Daniel.L.Winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,195 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik

**ADDENDUM**

# TABLE OF CONTENTS

44 U.S.C. § 1502......................................................................................A1

44 U.S.C. § 1503......................................................................................A1

44 U.S.C. § 1507......................................................................................A2

1 C.F.R. § 17.1.........................................................................................A3

1 C.F.R. § 17.2.........................................................................................A3

1 C.F.R. § 17.3.........................................................................................A4

1 C.F.R. § 17.4.........................................................................................A4

1 C.F.R. § 17.5.........................................................................................A4

1 C.F.R. § 17.6.........................................................................................A5

1 C.F.R. § 17.7.........................................................................................A5

**44 U.S.C. § 1502**

**§ 1502. Custody and printing of Federal documents; appointment of Director**

The Archivist of the United States, acting through the Office of the Federal Register, is charged with the custody and, together with the Director of the Government Publishing Office, with the prompt and uniform printing and distribution of the documents required or authorized to be published by section 1505 of this title. There shall be at the head of the Office a director, appointed by, and who shall act under the general direction of, the Archivist of the United States in carrying out this chapter and the regulations prescribed under it.

**44 U.S.C. § 1503**

**§ 1503. Filing documents with Office; notation of time; public inspection; transmission for printing**

The original and two duplicate originals or certified copies of a document required or authorized to be published by section 1505 of this title shall be filed with the Office of the Federal Register, which shall be open for that purpose during all hours of the working days when the National Archives Building is open for official business. The Archivist of the United States shall cause to be noted on the original and duplicate originals or certified copies of each document the day and hour of filing. When the original is issued, prescribed, or promulgated outside the District of Columbia, and certified copies are filed before the filing of the original, the notation shall be of the day and hour of filing of the certified copies. Upon filing, at least one copy shall be immediately available for public inspection in the Office. The original shall be retained by the National Archives and Records Administration and shall be available for inspection under regulations prescribed by the Archivist, unless such original is disposed of in accordance with disposal schedules submitted by the Administrative Committee of the Federal Register and authorized by the Archivist pursuant to regulations issued under chapter 33 of this title; however, originals of proclamations of the President and Executive orders shall be permanently retained by the Administration as part of the National Archives of the United States. The Office shall transmit immediately to the Government Publishing Office for printing, as

provided by this chapter, one duplicate original or certified copy of each document required or authorized to be published by section 1505 of this title. Every Federal agency shall cause to be transmitted for filing the original and the duplicate originals or certified copies of all such documents issued, prescribed, or promulgated by the agency.

**44 U.S.C. § 1507**

**§ 1507. Filing document as constructive notice; publication in Federal Register as presumption of validity; judicial notice; citation**

A document required by section 1505(a) of this title to be published in the Federal Register is not valid as against a person who has not had actual knowledge of it until the duplicate originals or certified copies of the document have been filed with the Office of the Federal Register and a copy made available for public inspection as provided by section 1503 of this title. Unless otherwise specifically provided by statute, filing of a document, required or authorized to be published by section 1505 of this title, except in cases where notice by publication is insufficient in law, is sufficient to give notice of the contents of the document to a person subject to or affected by it. The publication in the Federal Register of a document creates a rebuttable presumption—

(1) that it was duly issued, prescribed, or promulgated;

(2) that it was filed with the Office of the Federal Register and made available for public inspection at the day and hour stated in the printed notation;

(3) that the copy contained in the Federal Register is a true copy of the original; and

(4) that all requirements of this chapter and the regulations prescribed under it relative to the document have been complied with.

The contents of the Federal Register shall be judicially noticed and without prejudice to any other mode of citation, may be cited by volume and page number.

**1 C.F.R. § 17.1**

**§ 17.1 Receipt and processing.**

Unless special arrangements are made with the Director of the Federal Register, the Office of the Federal Register receives documents only during official working hours. Upon receipt, each document shall be held for confidential processing until it is filed for public inspection.

**1 C.F.R. § 17.2**

**§ 17.2 Procedure and timing for regular schedule.**

(a) Each document received shall be filed for public inspection only after it has been received, processed and assigned a publication date.

(b) Except as provided in paragraph (d) of this section, each document received by 2:00 p.m. which meets the requirements of this chapter shall be assigned to the regular schedule. Unless the issuing agency makes special arrangements otherwise, or the Office determines that the document requires a deferred schedule (see 1 CFR 17.7), receipt of a document by 2:00 p.m. is considered to be a request for filing for public inspection and publication on the regular schedule. Documents received after 2:00 p.m. which meet the requirements of this chapter shall be assigned to the next working day's regular schedule.

(c) The regular schedule for filing for public inspection and publication is as follows:

| Received before 2:00 p.m. | Filed for public inspection | Published |
|---|---|---|
| Monday ................. | Wednesday ............ | Thursday |
| Tuesday ............... | Thursday ............... | Friday |
| Wednesday ........... | Friday .................... | Monday |
| Thursday ............... | Monday ................. | Tuesday |
| Friday .................... | Tuesday ................ | Wednesday |

Where a legal Federal holiday intervenes, one additional work day is added.

…

## 1 C.F.R. § 17.3

**§ 17.3 Criteria for emergency publication.**

The emergency schedule is designed to provide the fastest possible publication of a document involving the prevention, alleviation, control, or relief of an emergency situation.

## 1 C.F.R. § 17.4

**§ 17.4 Procedure and timing for emergency publication.**

(a) Each agency requesting publication on the emergency schedule shall briefly describe the emergency and the benefits to be attributed to immediate publication in the Federal Register.  The request must be made by letter.

(b) The Director of the Federal Register shall assign a document to the emergency schedule whenever the Director concurs with a request for that action and it is feasible.

(c) Each document assigned to the emergency schedule shall be published as soon as possible.

(d) Each document assigned to the emergency schedule for publication will be filed for public inspection on the working day before publication unless emergency filing for public inspection is also requested.

## 1 C.F.R. § 17.5

**§ 17.5 Criteria for emergency filing for public inspection.**

An agency may request emergency filing for public inspection for documents to be published under the regular, emergency or deferred publication schedules.  Emergency filing for public inspection provides for the fastest possible public access to a document after it has been received, processed and assigned a publication date.  Emergency filing for public inspection is considered a special arrangement under § 17.2 of this part that results in deviation from the regular schedule for filing for public inspection.  A

- A4 -

document receiving emergency filing for public inspection remains on public inspection until it is published according to the schedule for publication.

## 1 C.F.R. § 17.6

**§ 17.6 Procedure and timing for emergency filing for public inspection.**

(a) Each agency requesting emergency filing for public inspection shall briefly describe the emergency and the benefits to be attributed to immediate public access. The request must be made by letter.

(b) The Director of the Federal Register shall approve an emergency filing for public inspection request whenever the Director concurs with a request for that action and it is feasible.

(c) Each document approved for emergency filing for public inspection shall be filed as soon as possible following processing and scheduling.

## 1 C.F.R. § 17.7

**§ 17.7 Criteria for deferred schedule.**

(a) A document may be assigned to the deferred schedule under the following conditions:

(1) There are technical problems, unusual or lengthy tables, or illustrations, or the document is of such size as to require extraordinary processing time.

(2) The agency concerned requests a deferred publication date.

(b) The Office of the Federal Register staff will notify the agency if its documents must be assigned to a deferred schedule.